(50 Misc. Rep. 88.)

### In re GERDES' ESTATE.

(Surrogate's Court, Kings County. March, 1906.)

**1. DEATH—EVIDENCE—BURDEN OF PROOF.**

Where a husband and wife perished in a common disaster, one claiming through an alleged survivorship of the husband has the burden of proving the prior death of the wife.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, § 7.]

**2. SAME—PRESUMPTIONS.**

Evidence examined, and *held* insufficient to show that, where a husband and wife perished in the same disaster, the wife died first, and it must be presumed that they perished at the same time, and her estate must be disposed of in accordance with such presumption.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Death, §§ 7–9.]

In the matter of the accounting in the estate of Margaretha Gerdes. Decree rendered.

Joseph J. Hood, for accounting party.

E. R. Thompson, for estate of Henry Gerdes.

Nicholas Schloeder, special guardian for Henrietta Postel.

Moses J. Harris, special guardian for Caroline Vogel and Lorette Boomgarden.

John C. Stemmermann, for St. Mark's Church.

CHURCH, S. The deceased was with her husband on an excursion aboard the General Slocum, on June 15, 1904, which steamer caught fire, resulting in a terrible loss of life. Both the deceased and her husband perished in this disaster, and the sole question arising in connection with this account is whether it shall be settled upon the theory that both died at the same time or whether either of them survived the other.

The question of survivorship, under circumstances of this character, has been a problem which has been presented to the courts from the earliest times. In the old civil law, where persons perished in a common disaster, a number of presumptions were established as a guide to the courts in determining the question of survivorship; but these presumptions have never been indulged in by the common law, and the problem has been treated as a question of fact to be disposed of in accordance with the circumstances surrounding the disaster. The leading case on the subject in this state is that of Newell v. Nichols, 75 N. Y. 78, 89, 31 Am. Rep. 424, in which the court states as follows:

"The rule is that the law will indulge in no presumption on the subject. It will not raise a presumption by balancing probabilities, either that there was a survivor, or who it was. * * * It is regarded as a question of fact to be proved, and evidence merely that two persons perished by such a disaster is not deemed sufficient. If there are other circumstances shown tending to prove survivorship, courts will then look at the whole case for the purpose of determining the question; but, if only the fact of death by a common disaster appears, they will not undertake to solve it on account of the nature of the question, and its inherent uncertainty."

That case also laid down the further rule that a person who claims that there was any survivorship must affirmatively prove the same.

This being the state of the law, the contestant has offered proof in an effort to sustain the contention that the testatrix herein predeceased her husband.

Perhaps, before taking up the specific evidence with relation to the death of the testatrix and her husband, a brief statement of the conditions surrounding the course of the General Slocum on the day in question will be valuable. The General Slocum on the fateful day was proceeding through the East river in the direction of Long Island Sound, having on board a large number of women and children; it being the occasion of a Sunday school picnic. At the eastward extremity of what can be known as the East river, the channel passes a place called the Sunken Meadow; and a short distance beyond that is the 138th Street Ferry, which, it appears, is the nearest place to the Alexander Street station house. This locality is referred to by some persons as Morrisania, which is the old name of the town prior to its incorporation in the city of New York. About a half mile beyond this point, the channel narrows down and passes between the North Brother and South Brother Islands. The General Slocum was a large excursion steamer, having three decks: The main deck, which was occupied principally by the cabins; the upper deck, upon which there was but a short stretch of cabin, but which was protected by the hurricane deck, which latter was without shelter of any kind. The deceased and her husband obtained seats upon the after portion of the upper deck, a short distance from the rail, and a little while before the disaster were seen, at this place sitting together, evidently admiring the scenery. The fire broke out on the boat in the vicinity of the Sunken Meadow. Intense excitement and confusion resulted, and while it lasted no one seems to have seen the testatrix or her husband on the upper deck near where they had been seated before the catastrophe. It appears that the captain of the boat kept her on her course until he reached the North and South Brother Islands, when he turned out of the channel and ran the boat aground on the South Brother Island. Although the bow of the boat was hard and fast, there were a number of feet of water under her stern; and, when she was thus run aground, she tipped over toward the island, and the persons on the hurricane deck were thrown off into the water.

Just before she was beached, a woman, who had been on the hurricane deck during the entire course of the excursion and who was familiar with the husband of the deceased, observed him standing in close proximity to where she was. She was unacquainted with his wife, but she states that no woman was apparently in his immediate company; and, upon being shown a photograph of the testatrix, asserts that she is quite positive that there was no person in the vicinity resembling the deceased. While, of course, this failure to identify the deceased as being present at the time is insufficient of itself to show that she was not there, yet, in view of other evidence, it becomes somewhat significant. It appears that at this time the persons on the lower decks were crowding up the stairs onto the hurricane deck, for what purpose it does not seem to be disclosed. While this was going on, the husband of the deceased was standing near the witness looking

over the stairs, up which the frightened excursionists were thronging from the deck below. Within a few moments after the witness thus observed the husband of the testatrix on the hurricane deck, the boat ran aground and the persons thereon were precipitated into the water, as before described. This was the last time the husband of the deceased was seen alive, and his body was not recovered until some seven or eight days after the disaster, when, among some of the bodies brought to the morgue, it was identified by members of his family. These facts, therefore, conclusively establish that the husband of the deceased was alive up to the moment that the boat was grounded on South Brother Island. There is no person living, however, who saw the testatrix after the alarm of fire was given.

The contestant on the first hearing had a theory that the upper or middle deck had fallen in before the hurricane deck, and that, therefore, sufficient had been shown to justify the presumption that she had predeceased her husband; and several adjournments were had at the request of the contestant to enable him to produce witnesses to substantiate this theory. But upon the second hearing the contestant not only abandoned this theory, but the testimony on such hearing was in direct conflict with the same. It appears from the evidence that, immediately after the alarm of fire was sounded, persons commenced jumping into the water to escape the flames, or were forced into the water in consequence of the crush and excitement; and, from the Sunken Meadow to South Brother Island, a continual string of unfortunates in a drowned or half-drowned condition was picked out of the water, and it was claimed that the deceased herein was one of such persons. A witness is produced who lived in Morrisania and was employed in a yacht club having its headquarters on South Brother Island. He was proceeding in a rowboat to Morrisania when his attention was attracted by a signal of distress given by the General Slocum. He hastened into the wake of the boat to endeavor to save the lives of those who were falling into the river and to assist in recovering the bodies of the drowned. He picked up the bodies of three persons and partially dragged them into his boat, and, this being evidently the limit of its capacity, started to row for the dock at 138th street. At the time he picked these bodies up, the General Slocum was still some distance from the South Brother Island, where she was grounded. Upon reaching the float, with the assistance of the man in charge of the same, he lifted out the bodies he had thus recovered and laid them on the float. It was apparent that they were all dead and that life was extinct when he had originally got them into his boat. Of these three bodies, one was that of a child of 3 or 4 years; another was that of a comparatively young woman, about 24 or 25 years of age; and the third was that of a woman in the neighborhood of 70, who was about 5 feet 10 inches in height, and, although possessing a large frame, was not corpulent.

It is the contention of the contestants that this woman was the testatrix herein, and that, as it is thus conclusively shown that she had been drowned before the boat was beached, the evidence that she predeceased her husband is complete. The sole question, therefore, is as

to the identification of the body of this woman as being the testatrix herein. Other than being able to give the brief description in question, the man who brought this body to the shore cannot more particularly identify her. A photograph of the deceased was offered in evidence. It was insufficient, however, to enable him to recall whether it resembles the deceased or not. This is not strange, in view of the fact that, immediately after he had lifted these bodies from the boat to the dock, he put forth again in his endeavor to rescue others. The man who was in charge of the float, however, one Daub, states that, as these were the first bodies which were brought ashore, he naturally was more impressed with the characteristics of the same than he was with those of the bodies that followed later, and, upon being shown the photograph of the testatrix, positively declared that the woman who was thus brought to the float was the deceased. He also declares that the body in question had a scratch or bruise along the right temple, as if she had been struck by something in falling from the boat, or in the water after she had left the boat, and that, in looking at the bodies, he commented upon this fact to certain of the bystanders who were assisting him. A Mr. Postel, the son-in-law of Mr. Gerdes, is then recalled to the witness stand, and he testifies that Mrs. Gerdes' body had such a mark upon the right temple, and in this he is corroborated by the undertaker and several other witnesses; but he had already been on the witness stand and testified to identifying the body at the Alexander Street station house and also at the morgue, and, upon being asked on that occasion if the face of the deceased was injured in any way, had replied it was not.

The fact that no witness who had seen the body had referred to this injury until after the testimony of Daub, which showed that this could be used as a mark of identification, is suspicious, and, taken with the previous testimony of Postel, strongly suggests that it was an afterthought in consequence of the statement of Daub. Both of two ladies, one a stepdaughter of the deceased, state that the deceased had a full set of false teeth, both upper and lower, and that, when the body was brought to the house, these teeth were missing, and that, in addition, the cheeks were bruised and were black and blue, but that there was no scar on the right temple, such as described. These ladies also state that, by reason of the above condition of the face of the deceased, she was almost unrecognizable, and that, as the photograph had been taken several years before her death, it did not look anything like her corpse, and that the witness Daub could not have identified her by means of the photograph. These witnesses are intelligent and disinterested, and their evidence impresses me as candid and truthful. It is, therefore, not only not proved that this body was that of the deceased, but the weight of evidence is that it was not. That being so, there being no sufficient evidence of survivorship, it must be assumed that the deceased and her husband both perished at the same time, and that her estate must be disposed of accordingly.

Let findings and decree be presented in accordance with this opinion.

Decreed accordingly.